## **APPENDIX**

1.    Exhibit B to plaintiff's complaint

2.    Durham Deposition – pp. 69-78

3.    Answers to Requests for Admissions

SP4-215-1(9-83)

PENNSYLVANIA STATE POLICE
LABORATORY DIVISION
GREENSBURG REGIONAL LABORATORY
P.O. Box "P"
Greensburg, PA  15601-0436

TELEPHONE:    (412) 832-3299

LAB REPORT:      G96-0988-G
REFERENCE NO:    E96-0222-S
                 E96-0469-S

REPORT DATE:     June 18, 1996
INCIDENT NO.:    96-02732-0

CASE:      RAPE
VICTIM:    Jeanette RATTLEY
ACCUSED:   Warren DURHAM, Jr.
SUSPECT:
PLACE:     Erie, Erie County, Pennsylvania
DATE:      January 23, 1996

FROM:      Erie Bureau of Police, Erie, Pennsylvania
DATE:      February 27, 1996

ITEMS:     K1    Dried blood standard from Warren DURHAM, Jr.. (Item #2, E96-0469-S).

           K2    Dried blood standard from Jeanette RATTLEY, (Item #1, E96-0469-S).

           Q1    Vaginal swabs collected from Jeanette RATTLEY, (Item #9a, E96-0222-S).

                 Specimens containing semen/spermatozoa are extracted in three
                 (3) fractions.  Fraction F is enriched for DNA from sources
                 such as white blood cells or epithelial cells (as found in
                 vaginal fluid).  Fraction M is enriched for DNA from
                 spermatozoa.  The third fraction consists of a direct extract
                 of the material containing the stain.  This fraction is
                 Fraction X and may contain DNA from either or both sources of
                 Fraction F and M.

RESULTS:   Deoxyribonucleic Acid (DNA) profiles for genetic loci D1S7,
           D2S44, D4S139, D5S110, D10S28, and D17S79 were developed from
           HAE III digested high molecular weight DNA extracted from
           specimens K1, K2 and Q1.

E96-0469-S

June 18, 1996
96-02732-0

Based upon these results, the DNA profile for Fraction M of
specimen Q1 matches specimen K1 at genetic loci D1S7, D2S44,
D5S110, D10S28, and D17S79. The probability of randomly
selecting an unrelated individual having the same profile is
rarer than 1 in 5.5 billion in the Caucasian, African American
and Hispanic populations. Genetic locus D4S139 was
inconclusive due to insufficient high molecular weight DNA but
does not exclude specimen K1 as a source of the DNA found in
Fraction M of specimen Q1.

Fraction X of specimen Q1 is consistent with a mixture of K1
and K2 at genetic loci D2S44, D4S139, D5S110, D10S28 and
D17S79. Genetic locus D1S7 was inconclusive.

Fraction F of specimen Q1 matches specimen K2 at genetic loci
D1S7, D2S44, D4S139, D5S110, D10S28 and D17S79.

DISPOSITION:    THE EVIDENCE MUST BE PICKED UP WITHIN THIRTY (30) DAYS FROM TH
ERIE REGIONAL LABORATORY.

THE REMAINING PROCESSED DNA FROM SPECIMENS EXAMINED BY DNA
ANALYSIS IS INCLUDED IN THE PACKAGED EVIDENCE AND CAN BE FOUND
IN A PACKAGE MARKED "PROCESSED DNA SAMPLES SHOULD BE
REFRIGERATED OR FROZEN." IT IS RECOMMENDED THAT THE EVIDENCE
BE STORED IN A REFRIGERATOR OR MANUAL FREEZER AND ISOLATED FRCM
EVIDENCE THAT HAS NOT BEEN EXAMINED.

Scott F. Ermlick
Laboratory Manager

cad

COPIES:    Chief, Erie Bureau of Police
Attn: Det. J. Washburn
Forensic Scientist Bruce Tackett
Greensburg Regional Laboratory

- 2 -

# EXHIBIT 2

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WARREN DURHAM, JR.,
    Plaintiff    :

v.    :  Case No. 04-297 Erie

CITY OF ERIE, PENNSYLVANIA, :
COUNTY OF ERIE, PENNSYLVANIA,:
CHRISTOPHER MCELYNN,  :
BRUCE TACKETT, JAMES WASHBURN,:
PATRICK DURKIN, and FRED P. :
ANTHONY,  :
    Defendants  :

Deposition of WARREN DURHAM, JR., taken before and by Sondra A. Black, Notary Public in and for the Commonwealth of Pennsylvania, on Monday, June 19, 2006, commencing at 10:00 a.m., at the law offices of Knox McGlaughlin Gornell & Sennett, PC, 120 West Tenth Street, Erie, Pennsylvania 16501.

For the Plaintiff:
  Warren Durham, Jr., Pro Se
  12119 Matherson Avenue
  Cleveland, OH 44135

For City of Erie, Officer James Washburn, and
Officer Patrick Durkin:
  Edmond R. Joyal, Jr., Esquire
  Law Office of Joseph S. Weimer
  975 Two Chatham Center
  Pittsburgh, PA 15219
For Bruce Tackett:
  Kemal Alexander Mericli, Esquire
  Office of the Attorney General
  564 Forbes Avenue
  Sixth Floor, Manor Complex
  Pittsburgh, PA 15219

Reported by Sondra A. Black
Ferguson & Holdnack Reporting, Inc.

## Page 2

1    I N D E X
2    WARREN DURHAM, JR.
3      Direct Examination by Mr. Joyal..........................3
4      Cross-Examination by Mr. Mericli......................68
5      Continued Direct Examination by Mr. Joyal..............77
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1    W A R R E N   D U R H A M, JR., first having
2    been duly sworn, testified as follows:
3
4    DIRECT EXAMINATION
5    BY MR. JOYAL:
6
7      Q.  Mr. Durham, we met. My name's Ed Joyal, and I
8    represent the City of Erie and two of the Erie police
9    officers, Officer Washburn and Officer Durkin, that you've
10   sued in your lawsuit here in the US District Court up here in
11   Erie.
12        What we're doing today is, we're taking your
13   deposition. And what that basically means is, you've already
14   been sworn in, and you're under oath. I'm going to ask you a
15   series of questions, and Sondra's going to take down my
16   questions and your answers. And then she's going to put
17   together a transcript. You sort of see one -- she's got one
18   in front of her, which is like a trial transcript. You've
19   seen something like that, right?
20     A.  Yes,
21     Q.  At the end of the deposition, you'll have a right to
22   make a judgement as to whether or not you want Sondra to send
23   you or make arrangements for you to read this transcript,
24   check it for accuracy and sign it, or waive that. What
25   waiving signature means basically is --

## Page 4

1        (Pause in the proceedings.)
2      Q.  Anyway, Mr. Durham, to finish up, you have a right
3    to make arrangements to read this deposition transcript.
4    There will also be a correction sheet attached to it. If you
5    believe anything was taken down incorrectly, your answers
6    weren't taken down correctly, you have a right to put those
7    corrections on the sheet, and then you sign it and send it
8    back to the court reporter, to Sondra.
9        What I will tell you is, if you do anything other
10   than correct spellings, change your answers in any
11   substantive way, we will have the right then to ask you to
12   come back and explain to us under oath why you changed those
13   answers, and the same thing would be said should this case go
14   to trial. Do you understand?
15     A.  Yes.
16     Q.  State your name for the record, if you would.
17     A.  Warren Durham, Jr.
18     Q.  Where do you live, sir?
19     A.  Cleveland, Ohio.
20     Q.  Give me your street address.
21     A.  12119 Matherson, M-A-T-H-E-R-S-O-N, Avenue,
22   Cleveland, Ohio.
23     Q.  How long have you lived there?
24     A.  50 years.
25     Q.  How old are you?

Warren Durham                                    Warren Durham, Jr. v. City of Erie, et al.

18 (Pages 69 to 72)

## Page 69

1    A.  Do you mean could I discuss that with you?
2    Q.  Do you know what probable cause -- the term
3  "probable cause" means?  You have alleged that my clients had
4  no probable cause to seize you.  Do you know what probable
5  cause means?
6    A.  Yes, I do.
7    Q.  What does it mean to you?
8    A.  I would have to read it from there.  I don't retain
9  this information.
10    Q.  I'll give you all the -- if you believe that the
11  definition of probable cause is contained in any of the
12  documents you have.  I'll give you as much time as you need
13  to read them.
14      MR. JOYAL:  Why don't we take a little break here.
15      (Recess taken from 11:49 a.m. to 11:54 a.m.)
16
17        CROSS-EXAMINATION
18  BY MR. MERICLI:
19
20    Q.  Mr. Durham, I represent Mr. Tackett, Bruce Tackett.
21  Do you recall whether or not he testified at either of your
22  trials?
23    A.  He testified at the first trial.  I wasn't even at
24  the second trial.
25    Q.  So do you recall the gist of his testimony at the

## Page 70

1  first trial?
2    A.  I have it here before me in the transcript.
3    Q.  Could you read it for us onto the record.
4    A.  Yes.  Just a moment.  Mr. -- okay.  66.  Mr.
5  McElynn, the case prosecutor, called Bruce Kevin Tackett as a
6  witness.  He was sworn in, and he testified as following:
7  That -- it said, "Mr. Tackett, could you" -- let me say,
8  first, now this goes to -- from Page 67 -- from Page 66 over
9  to Page 74.
10    Q.  That's fine.  Can you just read the entire exchange
11  then.
12    A.  Question by Mr. McElynn:  "Mr. Tackett, could you
13  give us your name and your business address for the record,
14  please, sir."
15      "Answer:  My name is Bruce Kevin Tackett.  I work at
16  the State Police crime laboratory, which is located in
17  Lawrence Park, Pennsylvania."
18      "Question:  And, Mr. Tackett, can you tell us how
19  long you have served with the Pennsylvania State Police."
20      "Answer:  I have been a forensic scientist with the
21  Pennsylvania State Police since February of 1984.  So a
22  little bit over 12 years now."
23      "Question:  And, sir, could you just briefly explain
24  for the jury what it is that a forensic scientist does."
25      "Answer:  As a forensic scientist, I utilize

## Page 71

1  scientific techniques to examine evidence that's been
2  submitted to the laboratory by law enforcement personnel.
3  Different police departments in the area utilize our
4  services.  I examine that evidence.
5      "I was -- I have a Bachelor's Degree in chemistry
6  from Indiana University of Pennsylvania, and a Master of
7  Science Degree in forensic chemistry from the University of
8  Pittsburgh.
9      "I was trained as a forensic scientist by the
10  Commonwealth of Virginia, where I worked in that bureau of
11  laboratories -- forensic laboratories for approximately a
12  year and a half.  And since February of 1984, I have been
13  working as a forensic scientist in the State Police
14  laboratory here in Erie.
15      "A forensic serutology -- in forensic serutology, I
16  examine blood stains and other bodily fluids to determine
17  whether or not a crime has been committed, and possibly
18  differentiate the person that could have deposited those
19  stains."
20      "Question:  Can you tell us if you were involved in
21  the testing or -- the testing of evidence of a Janette Ratley
22  and a case involving Warren Durham?"
23      "Answer:  Yes.  I did analyze some items in that
24  case."
25      "Question:  And can you tell us what it was that you

## Page 72

1  analyzed."
2      "Answer:  I received some clothing from the victim,
3  some clothing from the suspect, and a sealed sex crime kit
4  from the victim.  The sealed sex crime kit contained vaginal
5  swabs and smears; oral and rectal smears; genital swabbings;
6  dried secretions; public (sic) hair combings and public (sic)
7  hair standards; head hair standards; fingernail clippings;
8  blood and saliva standards; and a nasal mucus sample.  I also
9  received a sex crime kit from Warren Durham that contained a
10  blood standard, saliva standard, and head and pubic hair
11  standards."
12      "Question:  Now, sir, the rape kit that you
13  received, can you tell us what evidence was contained in that
14  rape kit."
15      "Answer:  Well, the rape kit from Janette Ratley
16  contained the items that I stated before, vaginal swabs and
17  smears and the like."
18      "Question:  Did those vaginal swabs or other swabs
19  that were taken in the case indicate the presence of seminal
20  fluids or semen?"
21      "Answer:  Yes.  I detected the presence of semen on
22  the vaginal swabs and smears and rectal swabs and smears.  In
23  addition, in the crouch (sic) of the victim's panties there
24  was a panty liner present, and on that panty liner, and also
25  in the crouch (sic) of the panties, there was some seminal

Warren Durham                                   Warren Durham, Jr. v. City of Erie, et al.

19 (Pages 73 to 76)

Page 73

1  material detected."
2       "Question: Now, were you able to take that seminal
3  fluid from those various swabs and articles of clothing?"
4       "Answer: Yes, I was."
5       "Question: What did you do with them?"
6       "Answer: I analyzed -- I analyzed using
7  conventional serotology. That is, type and analysis that I
8  performed here. I analyzed the seminal material or the
9  rectal swabs and smears, and also from the crouch (sic) of
10  the victim's panties. And I was able to determine an ABO
11  blood type and PGM, which is an enzyme type from that. And
12  the type that I got was consistent with having come from the
13  victim. I could not exclude -- it was not foreign from the
14  victim. I could not exclude the suspect from these samples.
15  I took the samples from the vaginal swabs, I took the vaginal
16  swabs and sent them to the Greensburg laboratory of the State
17  Police system where they performed DNA testing."
18       "Question: Let's back up a little bit. You said
19  the tests that you did showed that these are really
20  preliminary tests that you do; is that correct? They are not
21  as involved as a DNA testing?"
22       "Answer: With the advent of DNA technology, they
23  are considered to be preliminary testing now. They used to
24  be considered much more than that, but there have been many
25  further advances in forensic science since that period of

Page 74

1  time. These are considered preliminary testing. I did not
2  test the vaginal swab because I wanted to send the entire
3  sample that I had for a DNA testing. The other testings that
4  I did, I got blood typing results consistent with having come
5  from the victim. That's what I would expect from vaginal
6  swabs, and, also, from the crouch (sic) of her panties."
7       "Question: But you also said that these were
8  preliminary tests, that you did not exclude the Defendant."
9       "Answer, that is -- that's correct. He is a
10  nonsecretor. I could not pick up his ABO blood type from any
11  of his body fluids, i.e., semen or saliva or anything else
12  that might be present. The PGM type of Janette Ratley was
13  different from the one from Warren Durham. I picked up the
14  PGM type, which is the enzyme I tested. I picked up that PGM
15  type from her, I did not detect his. However, the amount of
16  sample present from her was much higher than the amount of
17  semen present."
18       "Question: Now, you told us that you took some of
19  the vaginal swabs and sent those down to the Greensburg lab;
20  is that correct?"
21       "Answer: Yes, I did."
22       "Question: And where those samples subjected to DNA
23  testing?"
24       "Answer: Yes, they were. Along with these samples,
25  I had requested and obtained fresh blood standards from

Page 75

1  Janette Ratley and Warren Durham, Jr. These were submitted
2  to the laboratory; dry samples of those were prepared and
3  sent along with the vaginal swab so that the DNA lab would
4  have an opportunity to prepare the blood standards of the two
5  people to the vaginal swabs."
6       "Question: Was that done in this case?"
7       "Answer: Yes, it was."
8       "Question: Was a report prepared showing what the
9  results of that testing is?"
10       "Answer: Yes, it was."
11       "Question: Have you received or reviewed a copy of
12  that report?"
13       "Answer: Yes, I have."
14       "Question: The Greensburg lab sent a copy to you;
15  is that correct?"
16       "Answer: Yes. I received a copy from the
17  Greensburg laboratory."
18       "Question: Could you explain to the jury what the
19  DNA test results were."
20       "THE COURT: Before he gives test results, Mr.
21  Durham, you have the right to cross-examine an expert witness
22  on his qualifications. That is, if you feel for some reason
23  he is not qualified as an expert, you may question him on his
24  qualifications. Do you have any questions on his
25  qualifications as an expert in the field of forensic

Page 76

1  science?"
2       "THE COURT: Mr. Durham remains silent. I take it
3  that means he has no questions on the qualifications. You
4  may proceed."
5       "MR. MCELYNN: Question: Thank you, Your Honor.
6  Mr. Tackett, I'll ask you again, did you have an opportunity
7  to review the test results of the DNA testing."
8       "Answer: Yes, I did."
9       "Question: And could you briefly describe those for
10  the jury."
11       "Answer: The vaginal swabs and smears were
12  extracted for high molecular weight DNA. DNA is basic
13  building blocks that is present in all nucleated cells in
14  your body. The DNA is essentially -- essentially has the
15  code for everything that you look like. All your genetic
16  information is included in the DNA.
17       "So they extracted the DNA from the vaginal swabs
18  and smears; they also extracted the DNA from the blood
19  samples that I provided to them. They compared the DNA from
20  the seminal material and found that the male fraction, i.e.,
21  that fraction that was collected from the semen itself, the
22  sperm cells, matched the DNA of Warren Durham.
23       "They provided some statistics, stating that the
24  possibility of finding an unrelated individual that would
25  have the same DNA profile that they identified was rarer than

## Page 77

1  1 in 5.5 billion in the African-American population,
2  Caucasian population, or Hispanic population."
3       "Question: Does that essentially mean that the
4  semen samples that were obtained from Janette Ratley matched
5  the DNA of Warren Durham?"
6       "Answer: Yes. That's what that means."
7       "Question: And you said it was 1 in 5.5 billion?"
8       "Answer: That's the statistics that they printed
9  out or they put into the report. They stated that it was
10 rarer than 1 in 5.5 billion. Population of the world is
11 approximately 5 1/2 billion people. So, essentially,
12 although every person in the world has not been tested for
13 their DNA profile, it is extremely unlikely that anyone other
14 than Warren Durham would have deposited that semen in Janette
15 Ratley's vaginal swabs."
16      "Question: You say the chance would have to be
17 greater than 1 in 5.5 billion?"
18      "Answer: Greater than 1 in 5.5 billion."
19      "Questions: Thank you. I have no further
20 questions."
21      "THE COURT: Mr. Durham, if you have any questions,
22 now is your time to ask them of this witness."
23      "THE COURT: The Defendant remains silent. I
24 presume he has no questions. You may step down."
25      "MR. McELYNN: We will call Janette Ratley."

## Page 78

1       Q.  Thank you, Mr. Durham. Can you tell me, sir, what
2  it is you say that Mr. Tackett did that violated your
3  constitutional rights?
4       A.  I don't have a copy of the Complaint.
5       Q.  Well, what -- do you have any idea of why you think
6  he violated your constitutional rights?
7       A.  Well, I would hesitate to guess.
8       Q.  It's your lawsuit, sir. So I wonder, what is it
9  that you say he did wrong that violated your constitutional
10 rights?
11      A.  Again, I don't have a copy of the Complaint, and I
12 would really hesitate to, at this time, guess what it may or
13 may not say.
14      Q.  Would you agree with me, then, sir, that whatever it
15 is you say is in the Complaint?
16      A.  Yes.
17      MR. MERICLI: I have no further questions.
18      MR. JOYAL: Do you want to stay with us, Kem, or --
19      MR. MERICLI: You know, if you're going to wrap it
20 up for your 1:00 appointment, I'd just as soon stay.
21      MR. JOYAL: That's fine.
22      MR. MERICLI: Thank you. I do appreciate your
23 courtesy, and I still would like to order the
24 transcript.
25

## Page 79

1       CONTINUED DIRECT EXAMINATION
2  BY MR. JOYAL:
3
4       Q.  Mr. Durham, back to what we were talking about. I
5  believe we were talking about probable cause and your
6  allegations against both Mr. Durkin and Mr. Washburn.
7       A.  I had a legal definition of probable cause that I
8  had filed in a brief to the court concerning this case. I
9  thought it was in here, but it's not.
10      Q.  Do you recall that that definition said a reasonable
11 suspicion that a crime had occurred and that the person they
12 were investigating had committed the crime?
13      A.  I would -- I wouldn't recall exactly.
14      Q.  Does any of that sound familiar to you?
15      A.  I -- I wouldn't really recall.
16      Q.  Well, do you think that maybe you tried to get a
17 definition of probable cause before you filed your Complaint
18 alleging that they had no probable cause to arrest you?
19      A.  I remember utilizing the legal definition of
20 probable cause in one of my memorandums of law.
21      Q.  Let's go through, if we could -- and I'm going to
22 allow you, if you want to take a look at this, to see it.
23 But let me just -- let me tell you a couple things -- or let
24 me ask you if you knew these things, all right, from the
25 trial. And I presume -- I think you stopped -- the

## Page 80

1  transcript there said that they were going to call Ms. Ratley
2  as a witness right after Mr. Tackett?
3       A.  Yes.
4       Q.  So do you have her testimony there?
5       A.  Yes.
6       Q.  May I see it, because I don't have a copy of it with
7  me. I think you just probably took the pen out from where it
8  was. Just let me have it, I'll take a look at it. You can
9  take your papers out of there.
10      A.  Yes. That's where her testimony starts, Page 74.
11      Q.  Do you know what an eightball is?
12      A.  Do I know?
13      Q.  Yes.
14      A.  I have no idea.
15      Q.  So you don't know whether eightball has anything to
16 do with crack cocaine, do you?
17      A.  I have no idea.
18      Q.  It wasn't one of the things that you were involved
19 in when we were talking about your criminal record for drug
20 abuse?
21      A.  I don't recall any reference to an eightball that we
22 discussed.
23      Q.  All right. You and I -- no, I didn't ask you that.
24 I know we didn't discuss it. I just brought it up because
25 it's in her testimony. I asked you whether you knew about it

## Page 81

1  and whether you knew it was crack cocaine. And you said, no.
2  And I asked you whether that -- crack cocaine had anything to
3  do with your drug abuse arrest.
4      A.  No.
5      Q.  Did crack --
6      A.  No.
7      Q.  What type of drug was it?
8      A.  What type of drug was what?
9      Q.  Was involved in your -- remember we were talking
10  about the Cleveland arrest for drug abuse? Remember that?
11  You and I were talking about your criminal record?
12      A.  Let me say this so maybe you can understand my
13  position, I have a very short-term memory. I take
14  medications, and I did bring --
15      Q.  What medications do you take?
16      A.  Number of them.
17      Q.  Tell me about them. Well, let's do it this way:
18  What medications do you take that affect your memory?
19      A.  I take medication for depression, for personality
20  disorder, I -- I brung a list of them.
21      Q.  Why don't you get the list out.
22      A.  And I left them in my other briefcase in the car.
23      Q.  Let's go back then, all right, since you say that.
24          We're talking about the 1990 entry here, Agency Case
25  No. 193915, Cleveland Police Department, "Charge 1:  Drug

## Page 82

1  abuse, cocaine." This is the one where we talked about on
2  11/29/1990 that there was a guilty, fine, three-years'
3  probation. That was the one you told me at some other point
4  in time the judge came and took that away.
5      A.  Yes.
6      Q.  Then we talked about another one, which was 4/6/90,
7  which had to do with, again, the Sheriff's office of
8  Cleveland, drugs and possession of criminal tools. Now,
9  did --
10      A.  That's --
11      Q.  Now, one of these talks about cocaine. Was that
12  crack cocaine?
13      A.  It's only one of them that occurred. Now, the
14  other --
15      Q.  Which one occurred?
16      A.  Where the judge initially found me guilty, and later
17  on, and I can't recall how much later on, dismissed all of
18  them.
19      Q.  All right.
20      A.  I never had -- and just let me finish. I never
21  had -- the court monitored my blood, took urines, I have
22  never ever had a dirty urine or cocaine found in my system.
23      Q.  That was part of this thing where the judge
24  dismissed it?
25      A.  Right.

## Page 83

1      Q.  So he put you on a regimen of drug tests?
2      A.  Yes.
3      Q.  And after you went through a certain period of time
4  with the drug testing he dismissed the charge?
5      A.  No. From day one I took them.
6      Q.  From day one of the time you were arrested?
7      A.  Yes.
8      Q.  But it does talk about cocaine.
9      A.  I don't know, I never seen it.
10      Q.  I just read it to you, sir. I said, it said
11  cocaine. Does your recollection of the drug that you were
12  charged with abusing or possessing -- was cocaine of some
13  sort?
14      A.  No.
15      Q.  Your recollection is not that it was?
16      A.  Right. That's my recollection.
17      Q.  Let's go back to the probable cause. At the trial
18  Ms. Ratley testified about a man, described him as a black
19  male with shoulder-length gray hair, right?
20      A.  If that's what that transcript says, I agree.
21      Q.  Do you have a recollection -- okay. You agree with
22  me. And at the time you were a black male with long gray
23  hair?
24      A.  I still am a black male.
25      Q.  But your hair is not --

## Page 84

1      A.  Shorter hair.
2      Q.  -- not long. You also understood that she gave the
3  police a license plate from Ohio. That when they ran it,
4  came back registered to a vehicle registered in your name.
5      A.  Okay. Let me --
6      Q.  No. Do you understand that that's what happened?
7      A.  Because there is a case pending against your
8  clients --
9      Q.  Which is what we're talking about.
10      A.  Another case.
11      Q.  Well, that one, I believe, has already been
12  dismissed.
13      A.  That one has not.
14      Q.  Sir, you don't have a right not to answer my
15  questions in a civil proceeding.
16      A.  I'm not refusing to answer your questions. I'm --
17  it's to your advantage to hear this. If you don't want to
18  hear it, I'll tell you.
19      Q.  I'll make a judgment as to whether it's to my
20  advantage. Tell me --
21      A.  I'll make a -- what was your question?
22      Q.  Do you know that Ms. Ratley gave license plate
23  number, that we've already discussed, an Ohio license plate
24  WOT-579, that subsequently came back, when the police checked
25  it out, registered as a vehicle that you owned?

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WARREN DURHAM JR.,                  )    C.A. No. 04-297 ERIE
              Plaintiff         )
        V.                        )    District Judge McLaughlin
                                 )    Magistrate Judge Baxter
CITY OF ERIE, ET AL.                )
           Defendants.

ANSWERS TO
## REQUEST FOR ADMISSIONS

Pursuant to Fed.R.Civ.P. 36 the Plaintiff Warren Durham Jr. requests Defendant Bruce Kevin Tackett to make the following admissions or denials for the purpose of this action only and subject to all pertinent objections to admissibility which may be interposed at the trial:

1. That each of the following statements is true or false.

a. That during Plaintiff's criminal trial on July 9, 1996 at 435 of 1996 you worked as a forensic scientist for the City of Erie Police Department. [ ] True [ ] False

b. That the DNA report you received from the Pennsylvania State Police Greensburg Laboratory (Lab Report G-96-0988-G, Report Date June 18, 1996) was inconclusive due to insufficient high molecular weight DNA at genetic locus D4S139; and inconclusive at genetic locus D1S7. [ ] True [ ] False

c. That according to the DNA report from the Greensburg Lab, no genetic locus tested conclusively at all 6 genetic locus concerning the Plaintiff. [ ] True [ ] False

d. That during the Plaintiff's criminal trial on July 9, 1996, the Pennsylvania State Police Labs focused on six different genetic locus areas to determine matches. [ ] True [ ] False

e. That in July of 1996 under Pennsylvania state law, a DNA match is only conclusive when all 6 genetic locus are found. [ ] True [ ] False

f. That you omitted telling the jury in Plaintiff's criminal trial that the DNA report from the Greensburg Lab was inconclusive. [ ] True [ ] False

g. That in the DNA report from the Greensburg Lab, fracture X which consist of a direct extract of

the material containing the stain, that comes from fraction F (vaginal fluid) and fraction M (spermatozoa) is inconclusive at genetic locus D4S139. [ ] True [ ] False

h. That in the DNA report from the Greensburg Lab, fraction X of specimen Q1 (vaginal swabs) and a mixture of K1 (dried blood standard of Plaintiff) and K2 (dried blood mixture of Rattley) was inconclusive at genetic locus D1S7. [ ] True [ ] False

i. That you testified falsely at Plaintiff's criminal trial when stating to the trial court and jury that the DNA report from the Greensburg Lab conclusively matched the DNA of the Plaintiff. [ ] True [ ] False

j. That because you testified falsely at Plaintiff's criminal trial of a DNA match before the jury, it violated Plaintiff's constitutional rights to a fair trial. [ ] True [ ] False

k. That under Pennsylvania law at the time of Plaintiff's criminal trial as announced by the Pennsylvania Supreme Court, testimony about the statistical probability of a random DNA match was not admissible in Pennsylvania state courts. [ ] True [ ] False

l. That you did DNA testing on Plaintiff's clothing. [ ] True [ ] False

m. That you did DNA testing on the crime scene car. [ ] True [ ] False

n. That you unsealed the sex crime kit and tested, then analyzed the vaginal swabs contained inside. [ ] True [ ] False

Answers:   See attached.

WARREN DURHAM JR.
12119 MATHERSON AVE.
CLEVELAND, OH. 44135

DATED: 5/24/06

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM DURHAM, JR.,         )
                                        )
               Plaintiff,        )
                                        )
             v.                )  Civil Action No. 04-297 Erie
                                        )
CITY AND COUNTY OF ERIE, et al.,   )
                                        )
            Defendants.     )

## ANSWERS TO REQUEST FOR ADMISSIONS BY BRUCE TACKETT

1.     a.     False.

          b.     False as stated.  See attached lab report which speaks for itself and is not inconclusive: although inconclusive at the specified loci as represented these features did not exclude Mr. Durham.

          c.     False as stated.  See answer preceding.

          d.     True, as clarified by attached lab report.

          e.     False.

          f.     False because it was not: see answer at b.

          g.     See answer to d.

          h.     See answer above.

          i.     False.  See attached lab report.  Moreover, Mr. Durham's successful defense at his retrial was that the sex was consensual.

          j.     False: Mr. Tackett did not testify falsely.

k.    False.

l.    False: the Greensburg State Police Lab did the DNA testing.

m.    False.

n.    True.


By:    s/Kemal Alexander Mericli
       Kemal Alexander Mericli
       Senior Deputy Attorney General

OFFICE OF ATTORNEY GENERAL
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA   15219

Date: June 21, 2006

2

SP4-215-1(9-89)

PENNSYLVANIA STATE POLICE
LABORATORY DIVISION
GREENSBURG REGIONAL LABORATORY
P.O. Box "P"
Greensburg, PA  15601-0436

TELEPHONE:        (412) 832-3299

LAB REPORT:        G96-0988-G
REFERENCE NO:      E96-0222-S
                   E96-0469-S
REPORT DATE:       June 18, 1996
INCIDENT NO.:      96-02732-0

CASE:      RAPE
VICTIM:    Jeanette RATTLEY
ACCUSED:   Warren DURHAM, Jr.
SUSPECT:
PLACE:     Erie, Erie County, Pennsylvania
DATE:      January 23, 1996

FROM:      Erie Bureau of Police, Erie, Pennsylvania
DATE:      February 27, 1996

ITEMS:     K1    Dried blood standard from Warren DURHAM, Jr.. (Item #2, E96-
                 0469-S).

           K2    Dried blood standard from Jeanette RATTLEY, (Item #1, E96-046
                 S).

           Q1    Vaginal swabs collected from Jeanette RATTLEY, (Item #9a, E96
                 0222-S).

                 Specimens containing semen/spermatozoa are extracted in three
                 (3) fractions.  Fraction F is enriched for DNA from sources
                 such as white blood cells or epithelial cells (as found in
                 vaginal fluid).  Fraction M is enriched for DNA from
                 spermatozoa.  The third fraction consists of a direct extract
                 of the material containing the stain.  This fraction is
                 Fraction X and may contain DNA from either or both sources of
                 Fraction F and M.

RESULTS:   Deoxyribonucleic Acid (DNA) profiles for genetic loci, D1S7,
           D2S44, D4S139, D5S110, D10S28, and D17S79 were developed from
           HAE III digested high molecular weight DNA extracted from
           specimens K1, K2 and Q1.

E96-0469-S

June 18, 1996
96-02732-0

Based upon these results, the DNA profile for Fraction M of
specimen Q1 matches specimen K1 at genetic loci D1S7, D2S44,
D5S110, D10S28, and D17S79. The probability of randomly
selecting an unrelated individual having the same profile is
rarer than 1 in 5.5 billion in the Caucasian, African America
and Hispanic populations. Genetic locus D4S139 was
inconclusive due to insufficient high molecular weight DNA bu
does not exclude specimen K1 as a source of the DNA found in
Fraction M of specimen Q1.

Fraction K of specimen Q1 is consistent with a mixture of K1
and K2 at genetic loci D2S44, D4S139, D5S110, D10S28 and
D17S79. Genetic locus D1S7 was inconclusive.

Fraction F of specimen Q1 matches specimen K2 at genetic loci
D1S7, D2S44, D4S139, D5S110, D10S28 and D17S79.

DISPOSITION:     THE EVIDENCE MUST BE PICKED UP WITHIN THIRTY (30) DAYS FROM T
                 ERIE REGIONAL LABORATORY.

                 THE REMAINING PROCESSED DNA FROM SPECIMENS EXAMINED BY DNA
                 ANALYSIS IS INCLUDED IN THE PACKAGED EVIDENCE AND CAN BE FOUN
                 IN A PACKAGE MARKED "PROCESSED DNA SAMPLES SHOULD BE
                 REFRIGERATED OR FROZEN." IT IS RECOMMENDED THAT THE EVIDENCE
                 BE STORED IN A REFRIGERATOR OR MANUAL FREEZER AND ISOLATED FR
                 EVIDENCE THAT HAS NOT BEEN EXAMINED.

Scott F. Ermlick
Laboratory Manager

:ad

COPIES:     Chief, Erie Bureau of Police
            Attn: Det. J. Washburn
            Forensic Scientist Bruce Tackett
            Greensburg Regional Laboratory

- 2 -

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM DURHAM, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-297 Erie |
| | ) | |
| CITY AND COUNTY OF ERIE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within Answers to Request for

Admissions by Bruce Tackett was served upon the following via first-class mail on June 21,

2006.

Warren Durham, Jr.
12119 Matherson Avenue
Cleveland, OH  44135


Edmond R. Joyal, Jr., Esquire
Law Office of Joseph S. Weimer
975 Two Chatham Center
Pittsburgh, PA  15219

Kemal Alexander Mericli
Senior Deputy Attorney General

OFFICE OF ATTORNEY GENERAL
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA  15219