IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARREN DURHAM JR. | ) | C.A. No. 04-297 ERIE |
| Plaintiff | ) | |
| V. | ) | District Judge McLaughlin |
| | ) | Magistrate Judge Baxter |
| CITY AND COUNTY OF ERIE | ) | |
| ET AL.           Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

On October 6, 2004, Plaintiff commenced a civil rights action against Defendant Tackett pursuant to 42 U.S.C. Section 1983. This action resulted from the denial of constitutional right to a fair trial; introduction of false evidence; and conspiracy with other Defendants.

## II. STATEMENT OF UNDISPUTED, OR INDISPUTABLE FACTS

On July 9, 1996, Plaintiff's criminal trial commenced before Defendant Fred P. Anthony and jury. The Plaintiff had been ordered to trial pro se; he did not participate in the trial proceeding, including jury selection; offering no opening or closing statements. As a result, on May 27, 2004, the Third Circuit reversed the Plaintiff's criminal conviction based on the denial of his constitutional right to counsel. On September 21, 2004, the Plaintiff was retried, subsequently acquitted on all charges September 22, 2004. The Plaintiff did not participate in the retrial; nor did he have any input in the defense at his retrial.

During the trial proceedings, Defendant Tackett testified falsely, however, consistent with the Commonwealth's theory that the DNA evidence presented to the jury was a match, which conclusively demonstrated that the Plaintiff deposited the semen alleged to be found in the prosecutrix. The record clearly demonstrate that the DNA report testified too by Tackett and the Commonwealth was inconsistent with the truth.

Mr. Tackett's testimony essentially was that he personally never conducted the DNA

testing but he was responsible for sending the samples to the Greensburg Lab that actually conducted the DNA testing. The problem with this scenario is that Tackett unsealed the rape kit and did analyze vaginal swabs and smears, oral and rectal swabs and smears, genital swabbings. In addition he also tested the prosecutrix's panties and panty liner. (See: Answer to Admissions at n.) The DNA samples subsequently sent to the state police lab for testing was contaminated.

The DNA report itself shows "inconclusive due to insufficient high molecular weight DNA," and "inconclusive" in other key areas of the report. During the relevant period of Plaintiff's criminal trial, the Pennsylvania State Police Lab and generally all Labs across the Country used the same process in preparing DNA samples prior to it being analyzed. The Greensburg Lab focuses on six different areas to determine matches: D1S7; D2S44; D4S139; D5S110; D10S28 and D17S29. (See: Affirmative answer to Admissions at d.)

In the instant case, the Plaintiff's DNA finding of fact by the Greensburg Lab clearly demonstrated that his genetic loci at D4S139 and D1S7 was inconclusive. Thus, it was an impossibility for the jury to make any factual determination based on lies and deception. In effect, the jury's function, that of determining the facts from relevant evidence, was curtailed by the vigorous re-shaping of the evidence.

It must be noted that Defendant Anthony was served with the Complaint. He obtained counsel, which put in an appearance. (Exhibit A)

## III. ARGUMENT

Section 1983 provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws by any person acting under color of state law. The manufacturing of evidence, and conspiracy to obtain a wrongful conviction, indisputably denies the Plaintiff in the instant case rights secured by the Due Process Clause. Pierce v. Gilchrist, 359 F.3d 1279 (10th Cir.2004).

Mr. Tackett's assertion that he did not do the actual DNA testing complained of is of no moment. The argument by the Plaintiff is that he fabricated and disregarded what the DNA report actually stated. Mr. Tackett completely omitted telling the jury that the DNA report itself showed "inconclusive due to insufficient high molecular weight DNA," and "inconclusive at fraction X of specimen Q1 (vaginal swabs collected from the prosecutrix) and dried blood standards from the Plaintiff and the prosecutrix. That genetic locus D1D7 was inconclusive. In other words under Pennsylvania caselaw, it means no **"match."**

In order for a **"match"** to be conclusive under Pennsylvania state law, a **"match"** must be found for all six genetic locus. Commonwealth v. Blasioli, 454 Pa.Super. 207,231 n.24 (1996). Rather Mr. Tackett agrees or disagree, the state law in Pennsylvania concerning DNA matches is well settled. Fact is, the only six loci match contained in the Greenburg's report was that fraction F (as found in vaginal fluid) matched the vaginal swabs collected from the prosecutrix. However, the DNA report clearly demonstrated that Plaintiff's genetic loci was inconclusive at D4S139 and D1S7. It is undisputed that Mr. Tackett and the case prosecutor shared this knowledge months before the trial.

Several factors may affect a samples suitability for analysis. A false positive result **(incorrect identification of the suspect as a potential source of the forensic DNA)** or merely an inconclusive or uninterruptible result. To be interpretable the crime scene sample must contain enough DNA of sufficiently **high molecular weight DNA** to allow isolation of longer DNA fragments, which are susceptible to degradation. Federal Judicial Center,Reference Manual on Scientific Evidence, West Publishing Co., (1994)(sample Quantity and Quality at p.287).

Additionally, during Mr. Tackett's expert testimony, the prosecutor elicited from him that the DNA report provided some statistics stating that the possibility of finding an unrelated individual that would have the same DNA profile was rarer than on in 5.5 billion. That the semem obtained from the prosecutrix matched the DNA of the Plaintiff. That it was *"extremely unlikely*

*that anyone other than Warren Durham could have deposited that semen in Jeanette Rattley's vaginal swabs.*" (Exhibit B)  However, what the report actually stated was that genetic locus D4S139 was inconclusive due to insufficient high molecular weight DNA but does not exclude the Plaintiff.  Not even a tortured reading of the DNA report justify Tackett in telling the jury that it was a **"match."** Blasioli,supra.  Especially where Tackett omitted telling the jury where the report concerned the Plaintiff, that it was "inconclusive."  In other words ... no match.

Moreover, under Pennsylvania law as announced by the state supreme court in Commonwealth v. Crews, 640 A.2d 315,400 n.2 (1994), testimony about the statistical probability of a random DNA match does not meet the Frye  standard, and not admissible in Pennsylvania state courts. Frye v. United States, 293 F.2d 1013,1014 (D.C. Cir.1923).

In providing expert testimony, the expert witness may not act as a conduit, or transmitter of the contents of an extra judicial source. Primavera v. Celotex Corp., 608 A.2d 515 (1992).  The jury was permitted to hear this prejudicial testimony, *inter alia,* it presented an over-powering and persuasive argument from sources held in high-esteem i.e. the Commonwealth and its expert serologist. See,e.g., Cooper v. Burns, 545 A.2d 935 (1988).

## Civil Conspiracy:

Agreement is the *sine qua non* of a conspiracy.  As the Third Circuit has explained, to allege a civil conspiracy for purposes of 1983, the plaintiff must aver "a combinatijon of two or more persons to do a criminal act, or to do an unlawful act by unlawful means or for an unlawful purpose." Spencer v. Steinman, 968 F.Supp. 1011 (E.D. Pa.1977)(quoting Ammlung v. City of Chester, 494 F.2d 811,814 (3d Cir.1974).

Trial judges must ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable. General Elec. Co. v. Joiner, 118 S.Ct. 512 (1997).  The judge in considering admissibility does not decide whether the proposition or theories are true or false, rather, whether the expert is offering sufficiently reliable, solid, trustworthy science. Circumstances exist to demonstrate that Defendant Anthony followed an unconstitutional custom when not insuring the DNA evidence was relevant and reliable.

-4-

In Blasioli, the defense wanted to have admitted its expert witness, however, the trial court sustained on the basis that he did not testify to all of the facts and conclusions contained in the DNA report in the case. The report consisted of the conclusions of the DNA analysis that the expert himself could not affirm. Accordingly, the expert report was properly excluded from evidence as unreliable hearsay evidence.

As a result, the admission of the report would place the expert's conclusions before the jury without the jury also having before it the facts on which the defense expert based these conclusions. See, e.g., Maryland v. Craig, 496 U.S. 836, 845 (1990).

This is nearly a "mirror reflection" of the situation in Plaintiff's case. Mr. Tackett was permitted by Defendant Anthony to testify to the lab report done by Mr. Scott Emerick, a forensic scientist for the State Police at the Greensburg Lab, of which the conclusions of the analysis reached could not properly be affirmed by Tackett. Nevertheless, the jury was permitted to convict on misleading, inadmissible facts. The Commonwealth, nor Mr. Tackett, nor Judge Anthony offered any information as to how these conclusions were reached or who infact authored it at the Greensburg Lab.

In Cooper v. Burns, 545 A.2d 935, 941 (Pa.Super.1988), it was concluded that the reporting, non-testifying doctor had confirmed the testifying doctor's diagnosis, the testifying doctor was permitted to corroborate his own medical opinion by improper hearsay. The reporting doctor was not subject to cross-examination concerning his diagnosis, and the jury was unable to assess his credibility or his qualifications.

Clearly Judge Anthony, a jurist for numerous years, knows the law. Therefore, the possibility exist that Judge Anthony and Mr. Tackett had a meeting of the minds to do an unlawful act by unlawful means, for an unlawful purpose of depriving the Plaintiff of a fair trial. A claim of conspiracy is actionable here.

## IV. **CONCLUSION**

Based on the foregoing, judgment in this matter should be entered in favor of the Plaintiff as a matter of law, pursuant to Fed.R.Civ.P. 56.

*/s/ Warren Durham Jr.*
WARREN DURHAM JR.

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : : : | IN THE COURT OF COMMON PLEAS OF ERIE COUNTY, PENNSYLVANIA |
| v. | : : | CRIMINAL DIVISION |
| WARREN DURHAM, JR. | : : | Case No.:  435 of 1996 |

## ORDER

AND NOW, to-wit, this __10__ day of August 2004, upon information received that this Court has been named as a Defendant in a civil suit filed by the above named Defendant, it is hereby ORDERED and DECREED that this Court **RECUSES** itself from any cases which involve Warren Durham, Jr. **The Court Administrator is DIRECTED to REASSIGN this matter.**

BY THE COURT:

_____ J.

C:   District Attorney
     Warren Durham, Jr.
     Pete Freed, Court Administration

Page 69

1   A. Do you mean could I discuss that with you?
2   Q. Do you know what probable cause -- the term
3   "probable cause" means? You have alleged that my clients had
4   no probable cause to seize you. Do you know what probable
5   cause means?
6   A. Yes, I do.
7   Q. What does it mean to you?
8   A. I would have to read it from there. I don't retain
9   this information.
10  Q. I'll give you all the -- if you believe that the
11  definition of probable cause is contained in any of the
12  documents you have. I'll give you as much time as you need
13  to read them.
14      MR. JOYAL: Why don't we take a little break here.
15      (Recess taken from 11:49 a.m. to 11:54 a.m.)
16
17              CROSS-EXAMINATION
18  BY MR. MERICLI:
19
20  Q. Mr. Durham, I represent Mr. Tackett, Bruce Tackett.
21  Do you recall whether or not he testified at either of your
22  trials?
23  A. He testified at the first trial. I wasn't even at
24  the second trial.
25  Q. So do you recall the gist of his testimony at the

Page 70

1   first trial?
2   A. I have it here before me in the transcript.
3   Q. Could you read it for us onto the record.
4   A. Yes. Just a moment. Mr. -- okay. 66. Mr.
5   McElynn, the case prosecutor, called Bruce Kevin Tackett as a
6   witness. He was sworn in, and he testified as following:
7   That -- it said, "Mr. Tackett, could you" -- let me say,
8   first, now this goes to -- from Page 67 -- from Page 66 over
9   to Page 74.
10  Q. That's fine. Can you just read the entire exchange
11  then.
12  A. Question by Mr. McElynn: "Mr. Tackett, could you
13  give us your name and your business address for the record,
14  please, sir."
15      "Answer: My name is Bruce Kevin Tackett. I work at
16  the State Police crime laboratory, which is located in
17  Lawrence Park, Pennsylvania."
18      "Question: And, Mr. Tackett, can you tell us how
19  long you have served with the Pennsylvania State Police."
20      "Answer: I have been a forensic scientist with the
21  Pennsylvania State Police since February of 1984. So a
22  little bit over 12 years now."
23      "Question: And, sir, could you just briefly explain
24  for the jury what it is that a forensic scientist does."
25      "Answer: As a forensic scientist, I utilize

Page 71

1   scientific techniques to examine evidence that's been
2   submitted to the laboratory by law enforcement personnel.
3   Different police departments in the area utilize our
4   services. I examine that evidence.
5       "I was -- I have a Bachelor's Degree in chemistry
6   from Indiana University of Pennsylvania, and a Master of
7   Science Degree in forensic chemistry from the University of
8   Pittsburgh.
9       "I was trained as a forensic scientist by the
10  Commonwealth of Virginia, where I worked in that bureau of
11  laboratories -- forensic laboratories for approximately a
12  year and a half. And since February of 1984, I have been
13  working as a forensic scientist in the State Police
14  laboratory here in Erie.
15      "A forensic serutology -- in forensic serutology, I
16  examine blood stains and other bodily fluids to determine
17  whether or not a crime has been committed, and possibly
18  differentiate the person that could have deposited those
19  stains."
20      "Question: Can you tell us if you were involved in
21  the testing or -- the testing of evidence of a Janette Ratley
22  and a case involving Warren Durham?"
23      "Answer: Yes. I did analyze some items in that
24  case."
25      "Question: And can you tell us what it was that you

Page 72

1   analyzed."
2       "Answer: I received some clothing from the victim,
3   some clothing from the suspect, and a sealed sex crime kit
4   from the victim. The sealed sex crime kit contained vaginal
5   swabs and smears; oral and rectal smears; genital swabbings;
6   dried secretions; public (sic) hair combings and public (sic)
7   hair standards; head hair standards; fingernail clippings;
8   blood and saliva standards; and a nasal mucus sample. I also
9   received a sex crime kit from Warren Durham that contained a
10  blood standard, saliva standard, and head and pubic hair
11  standards."
12      "Question: Now, sir, the rape kit that you
13  received, can you tell us what evidence was contained in that
14  rape kit."
15      "Answer: Well, the rape kit from Janette Ratley
16  contained the items that I stated before, vaginal swabs and
17  smears and the like."
18      "Question: Did those vaginal swabs or other swabs
19  that were taken in the case indicate the presence of seminal
20  fluids or semen?"
21      "Answer: Yes. I detected the presence of semen on
22  the vaginal swabs and smears and rectal swabs and smears. In
23  addition, in the crouch (sic) of the victim's panties there
24  was a panty liner present, and on that panty liner, and also
25  in the crouch (sic) of the panties, there was some seminal

Page 73

1  material detected."
2      "Question: Now, were you able to take that seminal
3  fluid from those various swabs and articles of clothing?"
4      "Answer: Yes, I was."
5      "Question: What did you do with them?"
6      "Answer: I analyzed -- I analyzed using
7  conventional serutology. That is, type and analysis that I
8  performed here. I analyzed the seminal material or the
9  rectal swabs and smears, and also from the crouch (sic) of
10 the victim's panties. And I was able to determine an ABO
11 blood type and PGM, which is an enzyme type from that. And
12 the type that I got was consistent with having come from the
13 victim. I could not exclude -- it was not foreign from the
14 victim. I could not exclude the suspect from these samples.
15 I took the samples from the vaginal swabs, I took the vaginal
16 swabs and sent them to the Greensburg laboratory of the State
17 Police system where they performed DNA testing."
18     "Question: Let's back up a little bit. You said
19 the tests that you did showed that these are really
20 preliminary tests that you do; is that correct? They are not
21 as involved as a DNA testing?"
22     "Answer: With the advent of DNA technology, they
23 are considered to be preliminary testing now. They used to
24 be considered much more than that, but there have been many
25 further advances in forensic science since that period of

Page 74

1  time. These are considered preliminary testing. I did not
2  test the vaginal swab because I wanted to send the entire
3  sample that I had for a DNA testing. The other testings that
4  I did, I got blood typing results consistent with having come
5  from the victim. That's what I would expect from vaginal
6  swabs, and, also, from the crouch (sic) of her panties."
7      "Question: But you also said that these were
8  preliminary tests, that you did not exclude the Defendant."
9      "Answer, that is -- that's correct. He is a
10 nonsecretor. I could not pick up his ABO blood type from any
11 of his body fluids, i.e., semen or saliva or anything else
12 that might be present. The PGM type of Janette Ratley was
13 different from the one from Warren Durham. I picked up the
14 PGM type, which is the enzyme I tested. I picked up that PGM
15 type from her, I did not detect his. However, the amount of
16 sample present from her was much higher than the amount of
17 semen present."
18     "Question: Now, you told us that you took some of
19 the vaginal swabs and sent those down to the Greensburg lab;
20 is that correct?"
21     "Answer: Yes, I did."
22     "Question: And where those samples subjected to DNA
23 testing?"
24     "Answer: Yes, they were. Along with these samples,
25 I had requested and obtained fresh blood standards from

Page 75

1  Janette Ratley and Warren Durham, Jr. These were submitted
2  to the laboratory; dry samples of those were prepared and
3  sent along with the vaginal swab so that the DNA lab would
4  have an opportunity to prepare the blood standards of the two
5  people to the vaginal swabs."
6      "Question: Was that done in this case?"
7      "Answer: Yes, it was."
8      "Question: Was a report prepared showing what the
9  results of that testing is?"
10     "Answer: Yes, it was."
11     "Question: Have you received or reviewed a copy of
12 that report?"
13     "Answer: Yes, I have."
14     "Question: The Greensburg lab sent a copy to you;
15 is that correct?"
16     "Answer: Yes. I received a copy from the
17 Greensburg laboratory."
18     "Question: Could you explain to the jury what the
19 DNA test results were."
20     "THE COURT: Before he gives test results, Mr.
21 Durham, you have the right to cross-examine an expert witness
22 on his qualifications. That is, if you feel for some reason
23 he is not qualified as an expert, you may question him on his
24 qualifications. Do you have any questions on his
25 qualifications as an expert in the field of forensic

Page 76

1  science?"
2      "THE COURT: Mr. Durham remains silent. I take it
3  that means he has no questions on the qualifications. You
4  may proceed."
5      "MR. MCELYNN: Question: Thank you, Your Honor.
6  Mr. Tackett, I'll ask you again, did you have an opportunity
7  to review the test results of the DNA testing."
8      "Answer: Yes, I did."
9      "Question: And could you briefly describe those for
10 the jury."
11     "Answer: The vaginal swabs and smears were
12 extracted for high molecular weight DNA. DNA is basic
13 building blocks that is present in all nucleated cells in
14 your body. The DNA is essentially -- essentially has the
15 code for everything that you look like. All your genetic
16 information is included in the DNA.
17     "So they extracted the DNA from the vaginal swabs
18 and smears; they also extracted the DNA from the blood
19 samples that I provided to them. They compared the DNA from
20 the seminal material and found that the male fraction, i.e.,
21 that fraction that was collected from the semen itself, the
22 sperm cells, matched the DNA of Warren Durham.
23     "They provided some statistics, stating that the
24 possibility of finding an unrelated individual that would
25 have the same DNA profile that they identified was rarer than

Page 77

1    1 in 5.5 billion in the African-American population,
2    Caucasian population, or Hispanic population."
3         "Question: Does that essentially mean that the
4    semen samples that were obtained from Janette Ratley matched
5    the DNA of Warren Durham?"
6         "Answer: Yes. That's what that means."
7         "Question: And you said it was 1 in 5.5 billion?"
8         "Answer: That's the statistics that they printed
9    out or they put into the report. They stated that it was
10   rarer than 1 in 5.5 billion. Population of the world is
11   approximately 5 1/2 billion people. So, essentially,
12   although every person in the world has not been tested for
13   their DNA profile, it is extremely unlikely that anyone other
14   than Warren Durham would have deposited that semen in Janette
15   Ratley's vaginal swabs."
16        "Question: You say the chance would have to be
17   greater than 1 in 5.5 billion?"
18        "Answer: Greater than 1 in 5.5 billion."
19        "Questions: Thank you. I have no further
20   questions."
21        "THE COURT: Mr. Durham, if you have any questions,
22   now is your time to ask them of this witness."
23        "THE COURT: The Defendant remains silent. I
24   presume he has no questions. You may step down."
25        "MR. McELYNN: We will call Janette Ratley."

Page 78

1    Q.  Thank you, Mr. Durham. Can you tell me, sir, what
2    it is you say that Mr. Tackett did that violated your
3    constitutional rights?
4    A.  I don't have a copy of the Complaint.
5    Q.  Well, what -- do you have any idea of why you think
6    he violated your constitutional rights?
7    A.  Well, I would hesitate to guess.
8    Q.  It's your lawsuit, sir. So I wonder, what is it
9    that you say he did wrong that violated your constitutional
10   rights?
11   A.  Again, I don't have a copy of the Complaint, and I
12   would really hesitate to, at this time, guess what it may or
13   may not say.
14   Q.  Would you agree with me, then, sir, that whatever it
15   is you say is in the Complaint?
16   A.  Yes.
17        MR. MERICLI: I have no further questions.
18        MR. JOYAL: Do you want to stay with us, Kem, or --
19        MR. MERICLI: You know, if you're going to wrap it
20        up for your 1:00 appointment, I'd just as soon stay.
21        MR. JOYAL: That's fine.
22        MR. MERICLI: Thank you. I do appreciate your
23        courtesy, and I still would like to order the
24        transcript.
25

Page 79

1         CONTINUED DIRECT EXAMINATION
2    BY MR. JOYAL:
3
4    Q.  Mr. Durham, back to what we were talking about. I
5    believe we were talking about probable cause and your
6    allegations against both Mr. Durkin and Mr. Washburn.
7    A.  I had a legal definition of probable cause that I
8    had filed in a brief to the court concerning this case. I
9    thought it was in here, but it's not.
10   Q.  Do you recall that that definition said a reasonable
11   suspicion that a crime had occurred and that the person they
12   were investigating had committed the crime?
13   A.  I would -- I wouldn't recall exactly.
14   Q.  Does any of that sound familiar to you?
15   A.  I -- I wouldn't really recall.
16   Q.  Well, do you think that maybe you tried to get a
17   definition of probable cause before you filed your Complaint
18   alleging that they had no probable cause to arrest you?
19   A.  I remember utilizing the legal definition of
20   probable cause in one of my memorandums of law.
21   Q.  Let's go through, if we could -- and I'm going to
22   allow you, if you want to take a look at this, to see it.
23   But let me just -- let me tell you a couple things -- or let
24   me ask you if you knew these things, all right, from the
25   trial. And I presume -- I think you stopped -- the

Page 80

1    transcript there said that they were going to call Ms. Ratley
2    as a witness right after Mr. Tackett?
3    A.  Yes.
4    Q.  So do you have her testimony there?
5    A.  Yes.
6    Q.  May I see it, because I don't have a copy of it with
7    me. I think you just probably took the pen out from where it
8    was. Just let me have it, I'll take a look at it. You can
9    take your papers out of there.
10   A.  Yes. That's where her testimony starts, Page 74.
11   Q.  Do you know what an eightball is?
12   A.  Do I know?
13   Q.  Yes.
14   A.  I have no idea.
15   Q.  So you don't know whether eightball has anything to
16   do with crack cocaine, do you?
17   A.  I have no idea.
18   Q.  It wasn't one of the things that you were involved
19   in when we were talking about your criminal record for drug
20   abuse?
21   A.  I don't recall any reference to an eightball that we
22   discussed.
23   Q.  All right. You and I -- no, I didn't ask you that.
24   I know we didn't discuss it. I just brought it up because
25   it's in her testimony. I asked you whether you knew about it