IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARREN DURHAM JR., | ) | C.A. No. 04-297 ERIE |
| Plaintiff | ) | |
| V. | ) | District Judge McLaughlin |
| | ) | Magistrate Judge Baxter |
| CITY AND COUNTY OF ERIE | ) | |
| ET AL.         Defendants. | | |

**MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

On October 6, 2004, Plaintiff commenced a civil rights action against Defendants City of Erie, James Washburn and Patrick Durkin pursuant to 42 U.S.C. Section 1983. This action resulted from the denial of constitutional right to a fair trial; failure to train or supervise police officers; violation of constitutional rights under the Fourth and Fourteenth Amendments.

## II. STATEMENT OF UNDISPUTED, OR INDISPUTABLE FACTS

On the morning of January 23, 1996, Erie police knocked on the door of Plaintiff's home and were promptly admitted in by Plaintiff. The Defendant officers inquired as to the owner of the Oldsmobile parked in front of Plaintiff's house. Upon responding that the car was his, Plaintiff was arrested.

Approximately **six-days** after Plaintiff's arrest, while he was in the Erie County Prison, police officers led by Defendant Washburn gained forcible entry into his home. Donald Durham nor Henry Johnson were home. Detective Washburn testified that while searching upstairs in Mr. Johnson's room, he found a .32 caliber gun. Further stating that at the time he allegedly found the gun, he was wearing gloves, however, and curiously when the gun was taken to be fingerprinted, to many people had touched the gun. That the following day he took the gun to the prosecutrix's house for positive identification. On July 9, 1996, Plaintiff's criminal trial commenced before Defendant Anthony and jury. During the trial the gun was entered into

evidence before the jury, although Plaintiff was never charged with a gun.

The prosecutrix had informed the prosecution team that she lied about being raped by Plaintiff, she merely sought monies to support her drug habit.

The Defendants, after seizing Plaintiff's car, were aware that the prosecutrix lied about being "stalked" by Plaintiff.

Statements taken by Washburn from Henry Johnson, and others concerning the morning of January 23, 1996.

The DNA testing taken on January 24, 1996, at the Erie County Prison was suppressed by Defendant Washburn.

## III. ARGUMENT

The Plaintiff asserts that Defendants are liable for damages under 1983. A viable 1983 claim contains two specific components: (1) the conduct complained of was committed by a person acting under color of state law; and (2) this conduct deprived the plaintiff of rights, privileges, or immunities secured by the laws or Constitution of the United States. Hassoun v. Cimmino, 126 F.Supp. 2d 353 (D.N.J.2000). To establish a 1983 claim against the City, plaintiffs must identify a policy of the city's policymakers that caused the plaintiffs to be subjected to a deprivation of a constitutional right. See,e.g., Monell v. Department of Social Services of City of New York, 98 S.Ct. 2018 (1978). Official policy, for purpose of 1983 liability is a policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority. Pineda v. City of Houston, 124 F.Supp, 2d 1057 (S.D.Tex.2000). A municipality's inaction, specifically its failure to train or supervise officers adequately or failure to respond to complaints about the allegedly unconstitutional acts or officers, can also be an official policy subjecting it to 1983 liability. Russoli v. Salisbury TP., 126 F.Supp. 2d 821 (E.D.Pa.2000).

According to the Third Circuit in <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663 (3d Cir.1988), an official policy may be inferred from informal acts or omissions of supervising municipal officials. See: <u>Bd. of County Com'rs of Bryan County, Okl. v. Brown</u>, 117 S.Ct. 1382 (1997)(plaintiff must also demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences).

## **Municipal Liability**

Liability cannot be imposed on a municipality unless deliberate action attributable to the municipality itself is the moving force behind the deprivation of the plaintiff's federal rights. Similarly, an act performed pursuant to a "custom" and "policy" that has not been formally approved by a appropriate decision-maker may fairly subject a municipality on the theory that the relevant practice is so widespread as to have the force of law. Accordingly, proof that municipality's legislative body or authorized decision-maker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.

In the case, *sub judice*, Defendants violated Plaintiff's constitutional right to a fair trial, resulting in malicious prosecution. Here, Plaintiff essentially alleges that he was arrested, charged and prosecuted for rape based on evidence which the prosecution team knew to be tainted, falsified or otherwise unreliable.

During the Preliminary Hearing on Fedruary 22, 1996, Defendant Washburn testified that there were four separate search warrants executed in this case. Two were executed at the Erie County Prison (DNA rape kit; Plaintiff's clothing). One was issued for Plaintiff's home, the other one for his car. Defendant Washburn personally served the ones for the rape kit and the Plaintiff's home.

However, the DNA evidence (rape kit) taken on January 24, 1996, pursuant to the authority of Washburn, which evidence demonstrated Plaintiff's innocence was subsequently disposed of by Washburn. No evidence of that rape kit was made known to the prosecutor. See,e.g, <u>Commonwealth v. Hawk</u>, 709 A.2d 373 (1998)(negative test results is depositive of petitioner's denial of the rape charge).

Approximately **six-days** after Plaintiff's arrest, while he was in the Erie County Prison, Defendants Washburn and Durkin gained forcible entry into his home. (Exhibit A) Donald Durham nor Henry Johnson were home. The Defendants testified that while searching upstairs in Johnson's room they found a gun. Admitting this gun into evidence at the Plaintiff's trial to the jury caused undue prejudice. The Plaintiff was never charged with a gun. It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitute a denial of due process. Cole v. Arkansas, 68 S.Ct. 514 (1948).

The problem with this scenario, the Defendants never obtained a valid search warrant for Plaintiff's home, and the time period of the invalid warrant secured on January 23, 1996, had expired. (Exhibit B) There was no actual warrant for when the Defendants broke into Plaintiff's home on January 29, 1996.

For a search warrant to be valid, the Fourth Amendment require a warrant particularly describe the place to be searched, and person or thing to be seized. Horton v. California, 110 S.Ct. 2301 (1990). See: In Interest of Wilks, 613 A.2d 577 (Pa.Super.1992)(the search warrant failed to describe the premises to be searched with sufficient particularity because neither the search warrant nor the supporting affidavit of probable cause mentioned the number of rooms to be searched). Moreover, a search warrant directed against an apartment house, or other multiple-occupancy structure will be held invalid for lack of specificity if it fails to describe the particular room or subunit to be searched with sufficient definiteness to preclude a search of other units. Commonwealth v. Carlisle, 534 A.2d 469 (Pa.1987). A warrant directing a search of more than one living unit is valid only if there is probable cause that all are being used for the unlawful purposes involved.

There were no exigent circumstances. There is no justifiable search incident to arrest under the Pennsylvania Constitution save for the search of the person and the immediate area which the person occupies during his custody. Commonwealth v. White, 669 A.2d 896 (Pa.1995). A legitimate search incident to arrest is limited to the arrestee's person and to the area within his

immediate control, meaning the area from within he might gain possession of a weapon or destructible evidence. Chimel v. California, 89 S.Ct. 2040 (1969). It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a (valid) warrant are presumptively unreasonable. Payton v. New York, 100 S.Ct. 1371 (1980).

The Plaintiff must therefore show that the acts complained of occurred under color of state law and that Warren Durham Jr. was deprived of rights guaranteed by the Constitution or laws of the United States. Parratt v. Taylor, 101 S.Ct. 1908 (1981). The Plaintiff argues that the actions of the Defendants who entered his home resulted from the following official policies or customs of the Erie police department: (1)allowing unconstitutional searches of private residences and other property in violation of the Fourth and Fourteenth Amendments; (2)providing inadequate training and supervision; and (3)directing the Defendants to conduct law enforcement activities in an unsavory manner.

To support warrantless entry of a residence, exigent circumstances must exist prior to the time the police approach a residence. The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's home secure only in the discretion of police officers.

It is obvious that the Defendants failed to obtain a valid warrant for Plaintiff's home. The Defendants also ignore that the Plaintiff was arrested in his doorway, was handcuffed after an initial inquiry, and took to jail for further questioning. It simply cannot be ignored that after **six-days** the Defendants returned to the Plaintiff's home without a warrant, broke into his home and conspired with others to manufacture gun evidence they allegedly found upstairs. The same gun

which the subsequent jury on September 22, 2004 found not to be remotely connected to the Plaintiff, hence acquitted him on all charges.

## **Malicious Prosecution**

Under Pennsylvania law, one element of a malicious prosecution claim is that the criminal proceedings have terminated in favor of the plaintiff. Rose v. Bartle, 871 F.2d 331 (3d Cir.1989). The Plaintiff has thus satisfied one element with the reversal of his criminal conviction on May 27, 2004, and subsequent acquittal on September 22, 2004.

Notwithstanding the unlawful entry of Plaintiff's home, the manufacturing of evidence and introducing false testimony in a court of law, the Defendants encouraged the prosecutrix to swear false that a gun taken to her house by the Washburn was used by Plaintiff to forcible compulse her to perform sexual acts.

However, as well documented of record, the prosecutrix told the prosecution team that she had lied, that the Plaintiff never raped her, nor threatened her with a gun. (Exhibit C)

Moreover, the prosecution team were aware, or certainly should have questioned the prosecutrix's incredible story when she told Washburn that the Plaintiff had "stalked" her numerous times starting in November of 1995. That the Plaintiff was driving the same car, with the same Ohio license plates as that on January 23, 1996, date of alleged rape.

The Plaintiff avers that at no time was he living in or had been to Erie during any period of November of 1995. That he had not purchased said car until the last week of November of 1995, and that Ohio had not issued said license plates until the second week of December of 1995.

The Plaintiff's car had been impounded by the Erie police the morning of his arrest. The car title and registration were in their possession.

Additionally, it must be noted that Henry Johnson (a boarder) was present when the Plaintiff was arrested, and that he gave a statement to Washburn that the Plaintiff was home during the time period of the alleged rape. That the Plaintiff had not been in Erie at any time in 1995.

The Defendants were fully aware that it was an impossibility for the Plaintiff to have committed any criminal act using as a tool the alleged crime scene car.

It cannot be disputed that these Defendants initiated the criminal proceedings against the Plaintiff. Although it is not necessary that defendants initiate the proceedings himself. Liability for malicious prosecution can also attach when defendants influences a third party to initiate the proceedings. Although it is not necessary that defendants initiate the proceedings himself. Liability for malicious prosecution can also attach when defendants influences a third party to initiate the proceedings. Bristow v. Clevenger, 80 F.Supp. 2d 421 (M.D.Pa.2000).

These allegations form the basis not only of Plaintiff's malicious prosecution claim, but also his claim that he was denied a fair trial and that his arrest and imprisonment were unsupported by probable cause. Montgomery v. DeSimone, 159 F.3d 120 (3rd Cir.1998). When the probable cause determination depends upon disputed issues of fact, the court should submit the factual disputes to the jury, and then make the probable cause determination based upon the jury's findings. Bristow,supra.

## Qualified Immunity

Under the qualified immunity doctrine, a government official will be liable only if the plaintiff can show that the official violated clearly established law of which a reasonable person should have known. Harlow v. Fitzgerald, 102 S.Ct. 2727 (1982).

In this instance, it was clearly established that Defendants cannot conduct a warrantless search of Plaintiff's home. Especially where no warrant had been obtained even after **six-days** after Plaintiff's arrest. Even considering that Washburn had somehow gained access to a search warrant on January 23, 1996, it was not valid for January 29, 1996, the day of the unlawful bread-in.

## IV. CONCLUSION

Based on the foregoing, judgment in this matter should be entered in favor of the Plaintiff as a matter of law, pursuant to Fed.R.Civ.P. 56.

*Warren Durham Jr.*
WARREN DURHAM JR.

```
COMMONWEALTH OF PENNSYLVANIA  :
                              :
    vs.                       :    PRELIMINARY HEARING
                              :
WARREN DURHAM, JR.            :
```

       Preliminary Hearing in the above-captioned matter held on Thursday, February 22nd, 1996, commencing at 10:15 a.m., before District Justice Joseph R. LeFaiver, 460 East 26th Street, Erie, PA.

APPEARANCES:

    CHRISTOPHER McELYNN, ESQUIRE, Office of the District Attorney, Erie, Pennsylvania, attorney for the Commonwealth of Pennsylvania.

    KEVIN M. KALLENBACH, ESQUIRE, Office of the Public Defender, Erie, Pennsylvania, attorney for the Defendant.

          REPORTED BY:  JANIS L. FERGUSON
          REGISTERED PROFESSIONAL REPORTER

1   J A M E S  D.  W A S H B U R N, first having

2   been duly sworn, testified as follows:

4         THE COURT:  Please state your name for the Court.

5         THE WITNESS:  James D. Washburn.

6         THE COURT:  Your occupation?

7         THE WITNESS:  I'm a police officer for the City

8   of Erie.

9         THE COURT:  Attorney McElynn.

10        MR. McELYNN:  Thank you, Your Honor.

12                    DIRECT EXAMINATION

13  BY MR. McELYNN:

15      Q.   Detective Washburn, can you tell us if you were

16  involved in the issuance and execution of a search warrant

17  with relation to the Defendant in this case, Warren Durham?

18      A.   Yes.  There were four separate search warrants.

19      Q.   And where were these search warrants executed?

20      A.   Let's see.  Two would have been at the Erie

21  County Prison, one was at 2304 French, and then another one

22  was on the Defendant's vehicle, which was executed at the

23  Erie Police Station.

24      Q.   Can you tell us if you participated in the actual

25  search of 2304 French?

1    A.    Yes, I did.

2    Q.    Can you tell us what, if anything, of importance
3 was located there.

4    A.    Yes.  It would have been in the upstairs
5 northeast bedroom, we found a revolver matching the
6 description that Jeanette Rattley had given us that was used
7 during the commission of the crime.

8    Q.    All right.  And could you describe this revolver
9 for us?

10   A.    It was a U.S. Revolver, black -- Well, actually
11 it looked like a -- it was an older weapon, and some of the
12 bluing had come off.  Had black handles on it.

13   Q.    And you said it was a five-shot revolver?

14   A.    Yes.  Five-shot.  .32 caliber, I believe is the
15 caliber.

16   Q.    And this 2304 French, that was Mr. Durham's
17 residence?

18   A.    Yes.  That's where -- that's where he was found.

19   Q.    Did you take this gun and show it to Jeanette
20 Rattley?

21   A.    Yes, I did.

22   Q.    Could you tell us when and where that occurred.

23   A.    I believe it was on January 30th, if I'm not
24 mistaken.  But I took it to her residence on German, and it
25 was in a manila envelope.  I advised her that I was going to

1   show her the weapon and asked her if she could identify it,
2   fine, if she can't identify it, then just tell me that she
3   can't.  When I pulled the weapon out of the bag, she became
4   very emotional and positively identified the weapon as the
5   one that the Defendant had at the time.
6           MR. McELYNN:  I don't believe I have anything
7           further.
8           THE COURT:  Cross.
9
10                      CROSS-EXAMINATION
11  BY MR. KALLENBACH:
12
13      Q.    Detective, you only were involved in the search
14  of the residence?
15      A.    No.  I was involved in the search of the
16  residence, the execution on Mr. Durham himself, and the
17  execution on the Erie County Prison.
18      Q.    You had nothing to do with the vehicle search
19  then.
20      A.    Correct.
21      Q.    There were two warrants served on the Defendant
22  at the prison?
23      A.    No.  One was served on -- What had happened was
24  once his clothing had been accounted for in the prison, the
25  only way I could get them was to obtain a search warrant.

1   And the only way they could release them to me is if I had a
2   search warrant.  So it was issued on his property, the
3   property box, and I got that back.  That was the way I
4   obtained his clothing.  And then we also did another one for
5   blood, saliva, and hairs.
6        Q.    What was the clothing you recovered?
7        A.    There was a sweater, a jacket, a belt.
8        Q.    Did you know the color of these items?
9        A.    The sweater was kind of a multi-colored blue and
10  white, as I recall.  There were a pair of jeans.  And I want
11  to say the coat was like a blue -- blue/gray down-type coat.
12       Q.    Okay.  And the pistol you recovered, did you
13  check that for fingerprints?
14       A.    No.  It was not -- it was not done.  I had -- I
15  had gloves on at the time.  When it got to the station, in
16  order -- They wanted to make sure that it was unloaded.  Too
17  many people had touched the weapon.
18       Q.    What room in that home was the gun recovered?
19       A.    It was an upstairs bedroom.  As you go up the
20  steps, it would have been the first room on the left.  At
21  the top of the steps would have been the bathroom, and then
22  correctly across from the bathroom and to the south of the
23  steps.
24       Q.    Did you know whose room in the home that was?
25       A.    We did ask Donald Durham, who was the owner of

```
 1  COMMONWEALTH OF PENNSYLVANIA  : IN THE COURT OF COMMON PLEAS
                                  :
 2             -vs-                : OF ERIE COUNTY, PENNSYLVANIA
                                  :
 3  WARREN DURHAM, JR.             : CRIMINAL DIVISION
                                  :
 4                                 : No. 435 OF 1996

 5                        * * *

 6                   VOIR DIRE AND
                      JURY TRIAL
 7                   DAY ONE OF TWO

 8
     Proceedings held before the Honorable Fred P.
 9
     Anthony in Courtroom F, Erie County Courthouse,
10
     Erie, Pennsylvania, on Tuesday, July 9, 1996,
11
     commencing at 1:48 p.m.
12

13
     APPEARANCES:
14
     CHRISTOPHER M. McELYNN, Esquire
15   appearing on behalf of the Commonwealth

16   WARREN DURHAM, JR., Pro Se

17

18

19

20

21

22

23

24
     Jeanne M. Sykes, RPR -- Official Court Reporter.
25
```

COPY

1           THE WITNESS:  Thank you, sir.
2           MR. McELYNN:  Thank you, Your Honor.  Call Officer
3  Durkin.
4                     PATRICK DURKIN, called as a
5  witness, was sworn, and testified as follows:
6                     DIRECT EXAMINATION
7  BY MR. McELYNN:
8      Q.   Officer Durkin, could you state your name and your
9  business address for the record please, sir?
10     A.   Patrick Durkin, 626 State Street.
11     Q.   And, Officer Durkin, can you tell us how long
12  you've served as an Erie City police officer?
13     A.   Yes, sir, approximately five and a half years.
14     Q.   And, sir, can you tell us if you were involved in
15  the execution of a search warrant at 2304 French Street in
16  the Warren Durham case?
17     A.   Yes, sir, I did.
18     Q.   And can you tell us, what was your -- the extent
19  of your participation in that search warrant?
20     A.   We were assisting Officer DiLullo and Detective
21  Washburn with serving a search warrant at that address, 2304
22  French.  We were searching for a handgun possibly used in a
23  crime.
24     Q.   Were you the officer who searched the upstairs
25  area of the house?

60

A. Yes, I did, with another officer.

Q. And can you tell us if you located a handgun in the second floor, in an area of the second floor of the house at 2304 French Street?

A. Yes, sir, I did.

Q. Can you tell us how you happened to find that gun?

A. As I was in the northeast bedroom, there was a closet door that was off its hinges and not locked. It was leaning against the door frame, I would assume. And to get into that closet, you had to physically lift the door up and set it to the side to look into the closet.

As I was doing this, this door had a blue blazer sports coat on a hangar hanging on top of it. As I went to move the door, the sports coat swung and banged back into the door like there was something in the pocket. I looked in that pocket, and I found a handle of a revolver hanging out of the sports coat in the inside pocket.

Q. Officer, I'm going to show you what I've marked as Commonwealth's Exhibit 1. And ask you if you've seen this before and if you can identify it for us?

A. Yes, sir, this is the pistol that was in the pocket of the sports coat in the bedroom.

Q. And that is the handgun that you found?

A. Yes, sir, it is.

Q. And subsequently placed into evidence?

61

1  A.   Yes, sir, it was.
2  Q.   Now, at the time that you found it was it loaded?
3  A.   Yes, sir, it was.
4  Q.   And were those bullets also taken into evidence?
5  A.   Yes, sir, they were.
6  Q.   At this time, Officer, I'm going to hand you an envelope I've marked as Commonwealth's Exhibit 2. I'd ask you to open that and identify the contents for us?
9  A.   Inside are the three live .32 caliber bullets that I recovered from inside the gun and two spent casings.
11 Q.   And were those the casings and the bullets that you found in that handgun when you executed that search warrant?
14 A.   Yes, sir, they are.
15 Q.   And who did you turn the gun over to?
16 A.   I turned it over to the property sergeant. I took it down to the station after serving the search warrant and tagged those items.
19 Q.   After you found it, which officer did you hand it to?
21 A.   Detective Washburn recovered the weapon and examined the weapon.
23 Q.   Thank you, Officer. I have no further questions.
24       THE COURT: Any other questions, Mr. Durham?
25       (Pause.)

March 18, 1996

I **JEANETTE RATTLEY**, now admit that Warren Durham, Jr. is not the person that committed the rape that occurred on or about January 22, 1996.

Since identifying him on January 23, 1996, I have since encountered the person I feel is responsible for the rape.

Although their resemblance is close, I now do believe I have made a honest mistake and accused the wrong person.

I now state for the record that any and all sexual contact between Warren Durham, Jr. and myself was consensual and of my own free will.

It should be known that I initiated the contact between Donald Durham and myself for the purpose of correcting this wrong and Donald Durham has never approached me concerning this case.

I contacted Donald Durham of my own free will and was never threatened, cohered or intimidated into making this statement.

I freely offer this statement to right a wrong and to clear my own conscience and pledge to drop any and all charges against Warren Durham, Jr. in connection with the above mentioned rape.

Name **JEANETTE RATTLEY**

Signed *Jeanette Rattley*   Date 3/18/96

Witness **RALPH L. CLARK**

Signed *Ralph L. Clark*   Date 3/18/96

Witness **Donald L. Durham**

Signed *Don Durham*   Date 3/18/96